UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHAWN L. HUNT,

                         Plaintiff,                  No. 09-CV-6064 CJS

     -vs-

                                                DECISION AND ORDER

CNH AMERICA LLC,

                         Defendant.
_____

APPEARANCES

For Plaintiff:               Mark S. Nunn, Esq.
                            Fitzsimmons, Nunn, Fitzsimmons & Plukas, LLP
                            16 East Main Street, Suite 300
                            Rochester, New York 14614

For Defendant:           Vivian M. Quinn, Esq.
                            Nixon Peabody LLP
                            Key Towers at Fountain Plaza
                            40 Fountain Plaza, Suite 500
                            Buffalo, New York 14202

INTRODUCTION

Shawn Hunt ("Plaintiff") sustained injuries in a farming accident, when the tractor he was operating was struck from behind by another tractor, after the second tractor's brakes failed.  Plaintiff is asserting claims for negligence and strict products liability against CNH, Inc. ("Defendant"), the manufacturer of the tractor which struck him.  Now before the Court are the following applications: 1) Defendant's motion for summary judgment (Docket No. [#18]); 2) Defendant's motion [#23] to exclude the testimony of Plaintiff's expert;  3) Plaintiff's cross-motion [#26] to strike the testimony of Defendant's expert; and 4) Defendant's motion [#32] to strike supplemental evidence and testing by

1

Plaintiff's expert.  Defendant's motions are granted, Plaintiff's cross-motions are denied,

and this action is dismissed.

BACKGROUND

Unless otherwise noted, the following are the facts of this case, viewed in the light

most-favorable to Plaintiff.  On May 15, 2006, Plaintiff was an employee of a dairy farm

in Corfu, New York.  The farm utilized several tractors, including a Steiger CA-325

tractor ("the Steiger"), and a much smaller International Harvester tractor ("the

International Harvester").  Plaintiff's employer, Dan Miller ("Miller"), had purchased the

Steiger, in used condition, several years earlier.

The Steiger, which was manufactured by Defendant in 1982,  had a braking

system consisting of a single "air actuated" "power screw air disc brake." Affidavit of

Timothy Rhoades ("Rhoades Aff") at Ex. C, p. 9.  More specifically, the brake is a

"sliding-caliper-syle" brake, which Plaintiff's expert witness, Orla L. Holcomb, Jr.

("Holcomb"), described as follows:

> [T]here's two ways that you can – you can apply brakes on a disc brake.
>  . . .  On a fixed caliper brake, you have pistons on both sides of the disc.
> One set of pistons actuates the outboard lining, and another set operates
> the inboard lining[.]
> ***
> Now, to get away from having to put an apply mechanism on each side of
> the disc, they went to a [sliding] caliper brake.  Sometimes its called an
> anvil brake.  That means that all you need on the outboard end is some
> little mechanism to hold it.
> ***
> Sliding-caliper brakes, then, have only one apply system, be it a hydraulic
> piston or be it an air-applied piston, air-actuated piston.
>
> When you put the brakes on a [sliding] caliper brake, you are first applying
> the brake to the inboard side of the disc, and then the caliper head is

2

reacted by the other end of the hydraulics, and it pulls[1] the anvil into contact with the disc.[2]

[The type of brake on the Steiger tractor is] a sliding caliper.  I – *I call it a rail slider.*  There's two types of sliding calipers.  One is a  – a pin slider.  Pins – the brake slides on pins, and it pretty well controls the – the freedom of the disc – of the caliper to move.  It pretty well guides the caliper, let's say.  The other is a rail slider.  The rail slider is just an abutment upon which the brake head abuts and transfers the force from the lining to the anchor or, in the case of the Goodrich brake, to the brake support.

Holcomb Dep. at 172-174 (emphasis added).  Prior to the accident in this case, it appeared that the Steiger's brakes operated properly.  In fact, Plaintiff indicates that the brakes were highly effective. Plaintiff's Deposition ("Pl. Dep.") at 94.

Shortly before May 15, 2006, the Steiger's transmission failed, while being used for plowing at a neighboring farm, located about ten miles from Miller's farm.  Because the Steiger's transmission was damaged, it could not be driven.  Miller decided to have the disabled Steiger towed back to his farm, rather than attempting to repair it where it had broken down.  Consequently, on May 15, 2006, Miller directed Plaintiff and a co-

---

[1]This caliper movement is "minuscule" and not visible to the eye during braking, involving movement of "much less than 1/1000 of an inch." Holcomb Report, [#29] Ex. C at p. 1.

[2]Holcomb's description essentially tracks the description of a sliding-caliper brake found in *Dunlop Co., Ltd. v. Kelsey-Hayes Co.*, 364 F.Supp. 1094, 1111 (D.C.Mich. 1972), *aff'd* 484 F.2d 407 (6th Cir. 1973), *cert den.*, 415 U.S. 917: "Further development of the disc brake concept eventually resulted in another form which is commonly referred to as the "sliding" or "floating" caliper disc brake. The fixed caliper brake (the type involved in the prior three patents in suit) consists of pistons and friction pads on each side of the disc and an inert or stationary caliper. The hydraulic pressure is exerted in both sides of the caliper, forcing the opposing pistons against the pads which pinch the disc. The caliper itself is affixed to a stationary member of the wheel assembly. The sliding caliper brake has a piston on one side only of the caliper and hydraulic pressure is exerted on one side only, forcing the piston against one friction pad and that pad against one side of the disc. The action of the extension of the piston causes a "re-action" which forces the entire caliper to slide and brings the opposing friction pad into contact with the opposite side of the disc to create the pinching effect. Thus, the caliper itself is not stationary but must slide on an additional member which in turn is affixed to a stationary portion of the wheel assembly."

worker, Larry Carter ("Carter"), to take the smaller International Harvester to the neighboring farm and tow the much larger Steiger back to Miller's farm, using a large steel chain.

The Steiger's owner's manual warns against towing the tractor, to avoid damage to the tractor's transmission:

> TOWING
> If a problem should arise requiring repairs that cannot be done in the field, it is required that this tractor be transported on another vehicle and not towed.
>
> The tractor CANNOT be towed to start the engine.  Even though the transmission output shaft would be turning, the transmission internal oil pump would not.  In this situation the transmission could not be lubricated or pressurized and severe transmission damage will result.

Affidavit of Vivian Quinn ("Quinn Aff."), Ex. H.[3]  The tractor itself, though, did not bear any warning label cautioning users not to tow the tractor.  Additionally, the Steiger's owner's manual, in the section entitled "Safety," advised operators to use the tractor's *engine* to assist in braking when going down hills: "**<u>Do</u>** use the braking power of the engine; always downshift to lower gear before descending a steep grade.  Brakes should always be properly maintained and adjusted." Rhoades Aff., Ex. C at p. 6.  However, because the Steiger's transmission was disabled, its engine could not be used to assist with braking. *See*, Rhoades Aff. at ¶ 12 ("[G]iven the condition of the Steiger tractor transmission/drive train, Mr. Carter and Mr. Hunt could not rely on engine braking.").

In any event, despite these warnings and conditions, Plaintiff and Carter reluctantly followed Miller's order to tow the Steiger and attached plow along the chosen

---

[3]As can be seen, the manual does not indicate that towing poses any risk of danger to persons.

route, which included many large hills.  In that regard, Carter understood that towing the tractor in that fashion could be dangerous, "if something went wrong." Carter Dep. at p. 59.  Nonetheless, Carter indicated that he was not worried about the Steiger's ability to brake on hills. *Id*. at p. 63 (Indicating that he was not concerned about coming down hills).  Similarly, Plaintiff indicated that he had general misgivings about towing the Steiger, but "didn't think it would turn out as bad as it did." Pl. Dep. 115.

As noted above, the road between Miller's farm and the neighboring farm included a number of large hills.  Carter wanted to keep the towing chain between the two tractors taut while descending the hills, so he told Plaintiff not to use the brakes on the International Harvester, and to let him do the braking for both tractors using just the Steiger's brakes, and not its engine.[4] Carter Dep. at 63 ("I just told him, when we get to a hill, you just let me do the stopping, don't touch your brakes, because the chain will get slack, let me do the braking, I'll slow us both down.").  Immediately prior to attempting this operation, Carter examined and adjusted the Steiger's brakes, and he believed that they were in good working condition.[5]  Plaintiff and Carter then set out, with Plaintiff operating the International Harvester and towing the Steiger, and with Carter steering the Steiger and applying the brakes.

A few minutes into the journey, partway down a steep hill, Carter felt the Steiger's

---

[4]Carter indicated that the tractor's engine was running prior to the accident. Carter Dep. at p. 112-113.  However, Rhoades' contention that the tractor could not provide engine braking power is unchallenged.  Accordingly, it appears likely that Carter had the engine running so that the transmission oil pump would operate and thereby avoid further damage to the transmission during the towing operation.

[5]Based on Carter's description of how he adjusted the brakes, Plaintiff's expert, Mr. Holcomb, concludes that Carter was adjusting the "slack adjuster," which sets the distance between the brake pads and the disc. Holcomb Dep. at 144-147.

5

brakes fail.  At deposition, Carter stated that his braking "foot went to the floor," and "the

brakes let loose." Deposition of Larry Carter ("Carter Dep.") at pp. 89-90; *see also, id*. at

p. 97 ("I held my foot right on them, but there was nothing there.").  Unable to slow

down, the Steiger rammed into the back of the International Harvester, causing both

tractors to turn over onto their sides.  Carter was uninjured, but Plaintiff, who was not

wearing his seatbelt, sustained serious injuries to his right leg when he was partially

ejected from the International Harvester's cab.

    Immediately following the accident, Carter examined the Steiger's brakes, and

concluded that the cause of the accident was "self-explanatory."  According to Carter,

"[t]he brakes came apart.  The equipment malfunctioned."  Carter Dep. at 133.  More

specifically, Carter stated that, "*The brake pads had come apart. . . . The shoes came*

*off the backing*." *Id*. at 128 (emphasis added).  Carter did not observe anything else

unusual about the brakes, although he did observe that the brake disc was still warm. *Id*.

at 128-129.  Plaintiff later spoke to Carter about the accident, and Carter reiterated that

the brake pads had "fallen apart":  "[He said that] [t]he brakes got hot, they disintegrated;

therefore, it wouldn't stop. . . .  He said he pressed on the pedal and there was nothing

there, they fell apart." Pl. Dep. at 203-204.

    Immediately after the accident, Miller had the Steiger repaired,  with such repair

consisting only of installing "new brake pads." Carter Dep. at 133, 135-136; *see also id*.

at 136 ("I just asked [the mechanic] what he had to do, and he just said it needed new

pads.").  The repairman, Mr. Pfalzer ("Pfalzer"), "took the old pads, what was left of

them." *Id*. at 135.[6]  After the brakes were repaired, Carter and Miller continued to use the

Steiger for farming. *Id*. at 134.  Carter indicated that after the new brake pads were

installed, the Steiger "work[ed] fine." *Id*. at 134; *see also*, Miller Dep. at 116 (Indicating

that the tractor "operate[d] properly" after Pfalzer repaired the brakes).  There is no

indication that the Steiger's brakes failed at any other time.  Nor is Plaintiff aware of any

other instance of brake failure involving a Steiger CA-325 tractor.

On February 12, 2009, Plaintiff commenced this diversity action.  Presently, there

are claims pending, under theories of negligence and strict products liability, for: 1)

manufacturing defect; 2) design defect; and 3) failure to warn.[7]

On March 1, 2010, the Court issued a Scheduling Order [#16], directing Plaintiff

to identify any expert witnesses, and to provide expert reports, by May 17, 2010.  The

Scheduling Order further directed that all expert discovery in this action be completed by

August 31, 2010. *Id*.  During discovery, the parties exchanged expert reports and

deposed each other's experts.

As mentioned above, Holcomb is Plaintiff's retained expert.  Holcomb is a

mechanical engineer who, since 1969, has worked with air brakes, as a design engineer

and consultant, for companies including Bendix and Clark Equipment Company.

Holcomb Dep. at 176; Holcomb Aff. at ¶ ¶ 2-7.  Plaintiff's counsel retained Holcomb in or

about November 2009, which was approximately three-and-a-half years after the

---

[6]*See also*, Deposition of Dan Miller ("Miller Dep.") at 106-109.

[7]On May 6, 2009, Plaintiff filed an Amended Complaint [#5], which purported to state the following causes of action: 1) strict product liability; 2) negligence; 3) breach of express warranty; 4) breach of implied warranties; and 5) failure to warn.  The parties later stipulated to the dismissal of the claims for breach of express and implied warranties.

accident, during which time Miller had continued to use the Steiger. Affidavit of Vivian Quinn ("Quinn Aff."), Ex. E at 1.  Plaintiff retained Holcomb solely and specifically to consider whether there was a "design problem" with the Steiger's brakes. Holcomb Deposition ("Holcomb Dep.") at 75-76; id. at 99 ("[Plaintiff's attorney] asked me if I could see any design flaws[.]")s.

When Plaintiff's counsel retained Holcomb, he provided Holcomb with one of the brake pad carriers that Pfalzer had removed from the tractor when he repaired it following the accident.  Specifically, the part was "the remaining Carrier from what had once been an inboard Carrier and Lining [pad] assembly." Quinn Aff. Ex. E. at 1.[8]  Such "carrier" is the metal backing to which the inboard brake pad had been attached. Significantly, Holcomb was not able to examine the outboard brake pad, because it had either been lost or discarded.[9]

Upon examining the inboard brake pad backing, Holcomb observed that "[t]he lining material [i.e. the pad] was gone and the steel Carrier was misshapen and worn." Quinn Aff., Ex. E at 1.  Holcomb concluded, from his "visual analysis" of the part, that the brake pad was worn out prior to the day of the accident.[10]

Plaintiff's counsel also provided Holcomb with photographs of the Steiger's brake

---

[8]Apparently, this was the part retained by Mr. Pfalzer, the repairman.

[9]As noted above, with a sliding-caliper disc brake, the "inboard" brake pad is the pad which is pushed against the disc by the air piston, while the "outboard" brake pad is on the opposite side of the brake disc. Holcomb Dep. at 101.

[10]Quinn Aff., Ex. E  at 1, 2 ("Prior to the incident, the Carrier plate from the incident vehicle had been heated by non-braking action to hot forging temperatures.  The plate was worn and distorted before the incident.").  At deposition, Holcomb explained that the plate bore evidence, consisting of melted metal and lining wear, indicating that the damage occurred over a period of time, and not just during the incident at issue in this case. Holcomb Dep. at  112-120.

8

which were taken in January 2009, more than two-and-one-half years after the accident. Naturally, the brake pads depicted in the photos were not the same as those which were on the tractor at the time of the accident. Quinn Aff., Ex. E at 1.  Nevertheless, according to Holcomb, the photographs "showed an inboard lining [pad] completely worn while the outboard lining was relatively unworn." *Id*.  From these photographs and the worn inboard plate which he had been provided, Holcomb surmised, in his preliminary expert report, that the brake caliper was not sliding as it should, which prevented the outboard pad from engaging the disc. Holcomb Dep. at 175.  ("I at first thought it was the failure of the caliper head to slide, which caused the inboard lining to take most of the . . . actuation of the brake."); *id*. at 194.[11]

On April 20, 2010, Holcomb personally inspected the Steiger, and prepared a final inspection report. Affidavit of Vivian Quinn ("Quinn Aff."), Exhibit E, Holcomb Report, Appendix D, "Inspection of the Steiger C325 Brake on April 20, 2010."  Such inspection occurred approximately four years after Plaintiff's injury.  Holcomb initially noted that the inboard brake pad was contacting, or almost contacting, the disc, while the outboard pad was not. *Id*. at 1.  In addition, Holcomb observed that the motion of the "brake head" was "very unusual," in that, when the parking brake was applied, the outboard lining moved, while the inboard lining and piston remained stationary. *Id*. at 1.[12]
 Upon examining the brake pads, Holcomb estimated that the outboard lining was 0.705 inches thick, while the inboard lining was 0.675 inches thick, though he did not actually

---

[11]As discussed below, Holcomb later changed this theory, after he inspected the Steiger, and decided that it was the inboard lining which was not sliding. *Id*.

[12]Holcomb indicates that "[s]ince the service brake and parking brake use the same apply mechanism, the brake would respond the same with either park or service brake application." *Id*. at 2.

make "direct measurements." *Id*. at 2.  As for the brake disc,  Holcomb visually observed

that "the wear on the inboard side was insignificant  compared to the wear depth at the

outboard side," but did not measure the respective sides  of the disc. *Id*.  Holcomb also

observed that a "guide bar," which had been factory-welded onto the brake mount, was

missing, *Id*., and from this he concluded that the guide bar must have been broken off by

"a counter-clockwise rotation of the rails [upon which the caliper moved]." *Id*. at 4.

On May 20, 2010, Holcomb prepared his expert report. Quinn Aff., Ex. E.  As part

of his report, Holcomb assumes that at the time of the accident, the inboard brake pad

was significantly more worn than the outboard pad, as they appeared in the photos

taken in January 2009, though there is no proof of that.[13] Quinn Aff. Ex. E at 1.  Holcomb

further made this assumption even though he did not report similar uneven pad wear

when he personally inspected the tractor.[14]  On this point, although Holcomb visually

estimated, during his inspection, that the inboard pad was slightly thinner than the

outboard pad (0.675 inches thick vs. 0.705 inches thick), it is undisputed that inboard

pads ordinarily receive more wear than outboard pads.[15]  Moreover, Holcomb does not

know whether the inboard and outboard brake pads, when new, are the same thickness.

Holcomb Dep. at pp. 108-109.  Nonetheless, Holcomb assumes, in his report, that the

brake pads on the Steiger at the time of the accident had "grossly unequal wear" as

---

[13]In that regard, as noted above, the photographs taken in January 2009 show that the inboard lining was "completely worn while the outboard lining was relatively unworn."

[14]As noted above, Holcomb could not actually measure the thickness of the brake pads during his inspection.

[15]*See*, Holcomb's May 20, 2010 inspection report at p. 5 ("Inboard linings of caliper brakes usually wear more than outboard linings.").

depicted in the January 2009 photos. Quinn Aff., Ex. E at p. 1 ("This grossly unequal wear was assumed to exist at the time of the incident.").

Holcomb further contends that "[t]he usual cause of excess wear on the inboard lining of a sliding caliper disc brakes  is impaired 'sliding' of the caliper." Quinn Aff. Ex. E at 1.  Holcomb states that in considering the cause of the accident, he initially figured that such "impaired sliding" must have been caused by one or both of the following two factors:  1) "drag at the rails"; and/or 2) "unstable position of the rails." *Id*.  However, Holcomb ultimately rejected the idea that the caliper motion was impaired, and concludes, in his final report, that the cause of the uneven wear on the inboard lining is that the "piston and inboard Carrier and Lining" became "hung up," due to the "unstable fixation of the rails to the Brake Mount." *Id*.

Holcomb further contends that because the piston was "hung up," or stuck in place, the inboard lining failed to retract after being applied, and essentially rested against the disc all the while the tractor was operating, which caused significant wear to the inboard lining, but not the inboard side of the disc:

> When applying the air brake, the Brake Head Assembly moved fore and aft along the rails while the inboard Carrier and Lining and the Piston remained stationary – seemingly locked to the rails.  Another extraordinary condition observed was that nearly all of the disc wear occurred on the outboard face of the disc.  These two factors revealed the cause of the grossly disproportionate lining wear, i.e., the lack of freedom of motion of the inboard lining.
>
> When the brake is applied, the Brake Head and outboard lining are free to move, pushing the outboard lining against the disc and accomplishing the great majority of the stopping power.  The inboard lining is pushed against the disc only when the apply force is large enough to overcome the restriction at the inboard Carrier-rail contact.

11

> When the brakes are released, the inboard lining remains in contact with the disc, held by the restrained motion at the Carrier-rail interface. The disc, rotating at high speed (can be up to 1,000-2,000 rpm), wears away the inboard lining and heats up (thermal expansion of the disc potentially exacerbating the contact force on the inboard lining).
>
> Thus the inboard lining is subjected to relatively continuous and variable wear factors while the outboard lining wears only when actual vehicle braking occurs.

Quinn Aff., Ex. E, Holcomb Report at 7.  In short, Holcomb contends that the inboard lining remained in light contact with the disc, causing heat and excessive wear to the inboard lining, while simultaneously causing little wear to the inboard side of the disc. On the other hand, he posits that,  although the outboard lining was providing all of the braking action, it was less worn than the inboard lining, yet caused greater wear to the outboard side of the disc.

Holcomb contends that this proposed scenario was caused by a defective brake design.  Specifically, he states:

> The Steiger installation of the Goodrich brake on the tractor does not provide a secure pathway for the Brake Head Assembly operation.  The Steiger installation of the Goodrich brake could have been made secure by the simple relocation of the four mounting bolts.  The insecure Steiger installation of the Goodrich brake causes restrained motion of the inboard lining on the rails, precipitating grossly excessive lining wear and excessive heat build-up in the brake disc.[16]

Holcomb Report dated May 20, 2010, at p. 2.  That is, he maintains that improper design of the bolt placement allowed the brake assembly to move, which caused the inboard lining to become "hung up" on the rail. *Id*. at 3.  Again, Holcomb arrived at his conclusion

---

[16]Although Holcomb opines that the "hanging up" resulted in heat and excessive wear to the inboard pad, he does not explain how such fact is relevant to his "sudden ratcheting" theory.

concerning bolt placement in his report by performing a mathematical equation concerning "the braking forces transmitted from the brake carrier and linings to the support bracket," but did not test the theory. *Id*. at 3-7.

Holcomb's report does not opine that this "hanging up" of the inboard carrier and piston, by itself, caused the Steiger's brakes to fail on the day of the accident.  To the contrary, Holcomb's report indicates that even with the inboard piston "hung up" as he describes, the brake continued to function, with the outboard brake pad doing essentially all of the work.  Instead, Holcomb posits that the total loss of braking power occurred when the *outboard* brake pad also became disabled.  Significantly, Holcomb does not maintain that the outboard pad became disabled because it fell apart, as Carter's observations following the accident would indicate.[17]  Instead, Holcomb states that the outboard pad failed in the following manner:

> As the tractor was traveling down the increasing grade, the tractor operator began to apply the brake.  The braking action was accomplished by the outboard lining only, as the inboard Carrier and Lining was 'hung up.'  Increasing brake pressure caused the force on the piston to finally reach the level to move the inboard Carrier.
>
> <u>This sudden ratcheting motion of the inboard Carrier released the force on the outboard lining, thus ceasing braking action.</u>

*Id*. at 10-11. (emphasis added).  At the time he completed his report, Holcomb had not performed any testing to support this "sudden ratcheting" theory . Holcomb Dep. at 155-156.

---

[17]Holcomb indicates that he reviewed Carter's deposition testimony, but did not rely on it in forming his opinions, even though he had no reason to think that such testimony was unreliable. Holcomb Dep. at pp. 132-133.

At deposition, Holcomb reiterated and clarified the opinions in his report.  More specifically, he testified to the following points: 1) the inboard lining was worn and warped prior to the incident, Holcomb Dep. at 207-208; 2) the inboard lining was damaged by "non-braking action" - it was "just sitting there against the disc, getting worn and hot, *id*. at 208-209; 3) the outboard lining was "intact and functioning" prior to the accident,  id. at 205-206, 218; 4) without the outboard lining, the tractor would have had "practically no brakes," *id*. at 206, *see also id*. at 216 ("the inboard lining was not doing hardly any braking, and the outboard was."); and 5) the outboard lining was still intact after the accident, *id*. at 122-123.  On this last point, Holcomb assumes that the outboard lining was intact and functioning following the accident, since it was not retained following the accident. *Id*. at 122-124.  Again, however, Holcomb has never actually seen the outboard brake pad that was on the tractor at the time of the accident. Nor, apart from speculation, is there any reason to believe that the failure to retain the outboard pad was intentional.

In any event, Holcomb further testified at deposition concerning the cause of the brake failure, as follows:

> A. The [inboard] carrier plate, because it is not free to move [because it is "hung up"], does very little braking.  . . .  [W]hen the brake is applied, this [inboard plate] is still  stuck, so this plate does not move towards the disc, but  the reaction apply [sic] system moves the caliper towards the disc, and the . . . caliper outboard lining then contacts the disc.  When . . .  the brake was cycled on and off, the outboard lining moved back and forth.  It . . . opened up a  . . . clearance between it and the disc[18] . . . [due to wearing away of the disc and/or pad], but the inboard lining moved hardly at all.  No – no appreciable amount.

---

[18]Holcomb did not quantify the size of this alleged gap.

Q. And what in you mind causes wear on the outboard side of the disc?

A. Because that's the side that's doing all the braking.

Q. Now, in your opinion, was the condition of the brake pads before they started down the hill enough to cause the brakes to, quote, cease action, as you claim?

A.  Not to cease action, no.[19]

Q.  Okay.  So is it your opinion that if action ceased, that was caused by what you call some kind of ratcheting of the right [lining carrier] – or the inboard [lining carrier]?

A. Yes.

***

Q. And how – can you explain to me how you think that occurred?

A. Well, as he's going down the – he's starting down the hill, he has to apply very little brake force – very little pedal effort until he reaches the more severe decline.  And as he's doing that, he's applying more and more brake pressure, if he's keeping a constant speed, until he reaches the brake force from the piston to this plate [inboard plate] – until that force is large enough to overcome the drag that is between the carrier plate and the brake support.  When that force gets – from the piston gets large enough to move that plate, then it jumps forward.[20]

Q. Inboard.

A.  Yes.

Q. Okay.

A. It jumps toward the disc, and when it jumps towards the disc, that means that you need more stroke of the system.  You – you – instantly you

---

[19]In other words, Holcomb is indicating that the Steiger's brakes still functioned, even though the inboard brake pad was "hung up."

[20]As discussed further below, it is unclear to the Court how the inboard plate could "jump forward" toward the disc if it was already resting against the disc, as Holcomb maintains.

lose braking because it's – it's jumping, and once it moves forward to take up the gap that exists, at that time the system did not have enough stroke to overcome the gap that existed before it ratcheted.

Q. And this is not something that you've tested.

A. No.

Holcomb Dep. at 221-224.

When Holcomb was asked how long this alleged loss of braking power would persist, he was unsure:

Q. Is this something that, in your opinion, would be temporary and then would have gone back to having – let me get your terminology – [braking] action, or is it something that would cease forever to have [braking] action?

A. I would suspect that the braking effort was less than the ten percent grade *until – until something – some mechanical adjustment was made*.

Q. I don't know what that means.

A. Well, you would have to – it – it jumps, and you lose braking *for a while*.

Q. That's what I'm asking. *What's a while?* Is that . . . a very, very short period of time, and as they traverse down the hill, would they get it [braking function] back again?

A. It would be noticeable, [sic] but *I would think he would not have much braking thereafter*.

Q. The operator [Carter] comments that . . . he didn't have *any* brakes.

A. Yes.

Q. I guess what I'm asking is:  If [Carter] continued to go down the hill for a while longer, would he experience something other than that?  I understand what you're saying is there would be some diminished [braking] capacity, but do you think he would start to experience braking again?

A. I – I don't know what their reactions were at that time, what the vehicle – I think once he lost braking – well, I'm – you get panicky, maybe.  I don't know.

Q. Let's do a hypothetical.  Say there was no tractor in front and this guy's not being towed.  He's driving down the hill, and he does this whatever it is as he's applying the brakes.  And if it happens the way you're testifying and he finds that there's a cease of action, if he continued down that hill for a little bit further, *would he get some of the action back?*

A. *Well, he might as the disc heated up, yes*.

Q. And I think –

A. *Yes, he would.  He would*.

Holcomb Dep. at 223-224 (emphasis added).

Defendant's retained expert is R.W. Brass ("Brass").  Brass is a design engineer, with a Master's Degree in Agricultural Engineering.  Although Brass is not a mechanical engineer *per se*, his degree in Agricultural Engineering was focused on  the sub-discipline of "Power and Machinery," which required him to take "all of the mechanical engineering, engineering mechanics, and kinematics courses that students in the mechanical engineering curriculum take." Brass Aff. [#37] at ¶ 13; *see also, id*. ("My course work and curriculum included notable segments on brake and clutch design.").  Brass worked for Deere & Company ("Deere") for over thirty years, designing tractors and machines for agriculture and construction.  Brass has not personally designed a tractor braking system, but he "understand[s] the design concepts for the various braking systems on tractors and heavy equipment." Brass Aff. [#37] at ¶ 2; *see also, id*. at ¶ 15 ("I have approved brake designs as part of overall machine designs.  Such was not done only on the basis of other persons' work, but with my own review of performance data

17

and reliability analysis, and with special attention to conformance with industry standards."). Brass also worked for Deere on issues relating to safety and "human factors,"  and more specifically, he helped develop and assess the adequacy of safety warnings on machinery.

On June 28, 2010, in connection with this case, Brass completed a "Summary Opinion Report (Docket No. [#30], Ex. G), which indicates that the subject Steiger tractor was properly designed, using common and accepted engineering processes, and was state-of-the-art at the time it was sold. *Id*. at 5.  For example, Brass states:

> Steiger used the best available guidance for evaluating brake designs for the Model CA325 as evidenced by their testing according to SAE [Society of Automotive Engineeers] Recommended Practices J1041 and J1152. The Model CA325 met the performance criteria outlined in these accepted guidelines, including those provisions for evaluating the fade (elevated temperature) resistance of the brakes under aggressive and repeated use.

*Id*. Brass also states that Steiger properly tested the tractor, and included appropriate safety warnings. *Id*.

Moreover, Brass disagrees with Holcomb's opinions concerning design defect:

> Mr. Holcomb bases his evaluation and [proposed] design [modification] only on calculations, therein using estimates and assumptions to reach his conclusions.  Mr. Holcomb makes no scientific or engineering connection to the specifics of the incident in question[.]

*Id*.  In this regard, Brass maintains that Holcomb's proposed modification of the brake system is speculative and untested. *See, id*. at 8 ("Not only is Mr. Holcomb's analysis not specific to the actual circumstances of this accident, but he did not conduct any confirmation tests as are a necessary part of good engineering practice.").  As for causation, Brass opines that the accident was caused by various factors, including the

failure to inspect and maintain the tractor, Plaintiff's and Carter's misuse of the tractor,

and Plaintiff's failure to wear a seat belt. *Id*. at 5-6.  As to these issues, Brass states:

> Available information indicates that [at] the time of the accident, the brake
> system on the [Steiger] in question was not in the same condition as it was
> at the time if left the control and custody of Steiger.  Most of the noted
> differences were not the result of normal wear, but were instead the result
> of improper prior repair.  Inspection of the brake system on 20 January
> 2009 revealed mounting hardware replacement, spring clip modification,
> removal of the automatic adjustment link, a repositioned actuating linkage,
> and contamination of the entire braking system by unrepaired transmission
> and/or engine oil leaks.  Combined with at least one completely worn out
> brake pad, the performance of the braking system at the time of the
> accident was significantly degraded from the time this machine left
> Steiger's possession.

*Id*. at 7.

On August 20, 2010, Plaintiff deposed Brass. (Docket No. [#30], Ex. I).  In his

testimony, Brass reiterates that the Steiger was modified in various ways after it left

Defendant's control.  For example, he states that the brake's automatic slack adjuster

was replaced with a manual slack adjuster,[21] *id*. at 28-29, 51, and that bolts on the brake

housing were replaced with smaller, weaker bolts.  In addition, Brass indicates that

someone added a "block" under the brake's spring clip mechanism, though the effect of

such modification is unclear. *Id*. at 70.  Brass agrees with Holcomb that the inboard

brake lining was  worn away prior to the accident, *id*. at 47-48, but believes that it is

impossible to know the condition of the outboard lining at the time of the accident, since

---

[21]It is clear that the braking system was not in the same condition as when it left Defendant's
control.  For example, Holcomb indicated that the original brake chamber and slack adjuster had been
replaced. Holcomb Dep. at p. 241.  The brake as designed and manufactured by Defendant in 1982 had
an automatic slack adjuster, which passed SAE testing, while upon inspection in 2010, the tractor had a
manual slack adjuster, which would not have passed SAE testing in 1982.

it was not preserved. *Id*. at 75-76.   Brass further states, though, that it is normal for the inboard pad to be more worn than the outboard pad, *id*. at 98, and Holcomb agrees. *See*, Holcomb's May 20, 2010 inspection report at p. 5 ("Inboard linings of caliper brakes usually wear more than outboard linings.").   Further, Brass attributes the worn-out condition of the inboard carrier to the fact that the brakes were not properly maintained, rather than to a design defect. *Id*. at 76.

Brass also disagrees that the inboard lining was "hung up," because if it had been, it would not have been as worn as it was.   *Id*. at 78, 80-81.   Specifically on this point, he states that if the inboard pad was hung up or stuck, as Holcomb maintains, it would experience some wear against the disc initially, but would not continue to be worn down, since it would be in a stationary position, and not continuing to press against the disc. *Id*.   Moreover, Brass doubts that the outboard pad did most of the braking, as Holcomb contends, because if it had, it would have been more worn. *Id*. at 78.[22]   Brass also contends that Holcomb's calculations concerning the bolts on the brake assembly contain errors, and he reiterates that Holcomb should have tested his proposed modification using SAE guidelines. *Id*. at 82-83, 87.   Finally, he reaffirms that the warning labels on the Steiger were appropriate. *Id*. at 94.

Plaintiff also deposed Robert J. Overmann ("Overmann"), the engineer who designed the Steiger while he was employed by Defendant. (Overmann Dep., [#30], Ex. J).   Overmann indicates that Defendant designed the tractor according to SAE brake specifications, for both construction tractors and agricultural tractors. *Id*. at 32-33, 42-43,

---

[22]Brass is referring to the outboard pad shown in the 2009 photographs.  Again, it is impossible to know the actual condition of the outboard brake pad at the time of the accident.

122.

Following the completion of discovery, on September 30, 2010, Defendant filed

the subject motion [#18] for summary judgment, and the companion motion [#23] to

exclude Holcomb's expert testimony, pursuant to Rules 403 and 702 of the Federal

Rules of Evidence ("FRE").  Defendant maintains that Holcomb's opinions should be

stricken because they are speculative and not supported by the facts of the case or by

reliable scientific methodology.  Plaintiff asserts, for example, that Holcomb did not test

his alternative bolt-placement design theory, which was developed solely for this

litigation, and that he is not qualified to offer an opinion concerning the failure-to-warn

claim.  As for the summary judgment motion, Defendant maintains that if Holcomb's

testimony is excluded, Plaintiff cannot prove his design defect claim.  Specifically,

Defendant states that the exclusion of Holcomb's opinions would leave "Plaintiff with no

admissible evidence of defect and causation." Def. Memo of Law [#18-1] at p.1.[23]

Defendant further maintains that regardless of whether Holcomb's opinions are allowed,

Plaintiff has no proof to support his manufacturing defect claim or his failure to warn

claim.  Additionally, as to the failure to warn claim, Defendant has submitted an affidavit

[#21] from a certified professional ergonomist, Rhoades, who indicates, to a reasonable

degree of scientific certainty, that the Steiger's labeling and operator's manual are

reasonable and not defective with a regard to any duty to warn, and that the accident

was not caused by Plaintiff's or Carter's failure to understand the risks involved in towing

---

[23]Defendant maintains that this is a case that will require expert testimony to establish a design defect, since, with regard to equipment like the subject tractor, the issues of defect and causation "are technical questions calling for specialized knowledge not possessed by the average person or juror." Def. Memo of Law [#18-1] at p. 12.

the Steiger.

On January 14, 2011, Plaintiff filed opposing papers, as well as the subject cross-motion [#26] to strike Brass's expert testimony.  Plaintiff dismissively contends that Defendant's motion to strike reveals a lack of understanding on Defendant's part, as opposed to any deficiency in Holcomb's report.  Specifically, Plaintiff maintains that Defendant's motion to strike is based on Defendant's "inability" to evaluate the Steiger's braking system, which was "patently inadequate and defective." Pl. Memo of Law [#27] at p. 1.  In this regard, Plaintiff alleges that Brass is not competent to perform such an evaluation, because he does not have a mechanical engineering degree. *See*, Pl. Memo of Law [#40] at 1.[24]  Plaintiff further suggests that Holcomb's report is above Brass's level of understanding. *See*, Pl. Memo of Law [#40] at 1 ("Defendant's objections [to Holcomb's report] find their genesis in its inability to intelligently review the contents of [Holcomb's] may 20, 2010 report[.]")  Plaintiff therefore contends that the Court should exclude Brass' proposed expert testimony, since he is not a mechanical engineer and has "demonstrated a lack of familiarity with the principles and concepts underlying proper brake design and function." Pl. Memo of Law [#27] at p. 1.

As to the alleged deficiencies in Holcomb's report, Plaintiff contends, for example, that Holcomb did not need to perform testing of his proposed alternative design for the brake assembly, since his calculations are sufficient.

----

[24] *See, Id*. ("Rather than question the competency of its own expert to perform such analysis, Defendant has instead asked this Court to strike the January 6, 2011 Affidavit of Mr. Holcomb and its related materials solely as a consequence of its own inability to understand Mr. Holcomb's concusions in this matter."); see also, id. at p. 2 ("This December 2010 testing demonstrated, for the benefit of those who were unable to appreciate or understand the principles underlying Mr. Holcomb's May 20, 2010, report, the soundness of Mr. Holcomb's methodologies and analysis.")

At the same time, though, Plaintiff asks the Court to accept a supplemental expert submission [#29], consisting of an affidavit from Holcomb, various photographs, test results, and an affidavit from Joal Derbas ("Derbas"), an employee of Clark Testing Services, LLC ("Clark"), concerning testing which Clark performed for Holcomb after the close of expert discovery.  Part of Holcomb's affidavit merely reiterates the opinions that he already provided, in his report and at deposition.  However, Holcomb's affidavit also refers to testing, performed by Clark, which was not included in the original expert disclosures. Holcomb Aff. [#29] ¶ ¶ 138-160.  Holcomb indicates that such testing confirms his earlier opinions, but maintains that the testing was "unnecessary," since his original opinions were sufficiently supported by his calculations on paper. *Id*. at ¶ 139. With regard to the testing, Holcomb indicates that he had to build a replica of the Steiger's brake mount assembly and support bracket, since the actual brake assembly is no longer available for purchase. *Id*. at ¶ 142.  Holcomb indicates that upon testing, the guide rail moved, causing a gap to appear between the alignment bar and the rail. *Id*. at ¶ ¶ 147-149.  Holcomb further states that he then tested a replica using his recommended bolt configuration, and that "there was no significant  movement in the simulated support bracket." *Id*. at ¶ 156.  Curiously, though, Holcomb apparently did not attempt to replicate the "hanging up" up the inboard piston and brake pad, or the sudden "ratcheting" effect.  Consequently, the testing that Holcomb performed showed some movement within the replica brake assembly, but did not necessarily establish the accuracy of his opinions concerning the "hanging up" effect or the "ratcheting" effect.

Plaintiff maintains that the Court should deny Defendant's request to exclude any

portion of Holcomb's submissions, and that if it does, there are triable issues of fact precluding summary judgment as to the design defect claim.

In addition, Plaintiff contends that summary judgment must be denied as to the failure to warn claim, since the danger posed by towing the Steiger, i.e. "catastropic loss of braking while under tow," was not open and obvious.  Plaintiff further maintains that an issue of fact is created as to the need for a warning label, because Miller, who employed Plaintiff and Carter, indicated that if there had been a "do not tow" decal on the tractor, he "probably" would not have told Plaintiff and Carter to tow the Steiger. *See*, Abbott Aff. [#30], Ex. D, Miller Aff. at ¶ 5.  However, unlike Defendant, Plaintiff does not provide any expert opinion concerning the need for a warning label.

Defendant counters that Holcomb's supplemental affidavit and testing should be stricken, since they were provided long after the Court-imposed deadline for provided expert discovery, and without the Court's permission.[25]  Specifically, as discussed above, all expert discovery was to be completed by August 31, 2010, *see*, Scheduling Order [#16], and Plaintiff did not provide the supplemental expert discovery until January 2011.  Alternatively, Defendant requests the opportunity to conduct additional discovery concerning Holcomb's late submission.

In is sur-reply, Plaintiff does not offer an explanation for his failure to request the Court's permission before filing the new expert testimony, but instead, contends that he was compelled to obtain such additional evidence to address errors in Brass' report. *See*, Abbot Affidavit [#41] at ¶ 3 ("The complained-of materials . . . were generated after

---

[25]Defendant also asks the Court to strike the testing performed by Clark.

a review of Defendant's September 30, 2010 motion papers revealed that Defendant had chosen to rely, in its effort to exclude the testimony of Mr. Holcomb, on opinion testimony that was demonstrably inexpert and unfounded."); *see also, id*. at ¶ 7 ("If Defendant has suffered any 'prejudice' in this matter, then such prejudice is solely attributable to its own failure to retain a qualified expert."); Pl. Memo of Law [#44] at p. 5 ("Had Defendant performed and disclosed a proper engineering analysis of the subject braking system and of Mr. Holcomb's may 20, 2010 report, Plaintiff would not have been compelled to provide layman's proof of applicable engineering principles.").

On June 10, 2011, counsel for the parties appeared before the undersigned for oral argument of the motions.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of*

*Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(c).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, it is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citations omitted). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

     Plaintiff is asserting causes of action, under theories of negligence and strict products liability, for defective product manufacture, defective product design, and failure to warn.  However, Defendant maintains, and the Court agrees, that Plaintiff has failed to

demonstrate a prima facie manufacturing defect claim.[26]  Accordingly, Defendant is

entitled to summary judgment on the manufacturing defect claim.

As for the remaining claims, alleging a design defect and failure to warn, the

applicable legal principles are clear:

> Under New York Law, a manufacturer can be liable for injury caused by the
> manufacturer's product under theories of negligence . . . and strict liability
> in tort.
>
> ***
>
> A claim of negligence requires that the plaintiff prove that the manufacturer
> was responsible for a defect that caused injury, and that the manufacturer
> could have foreseen the injury.
>
> ***
>
> A claim under strict products liability law requires a showing that: (1) the
> product is "defective" because it is not reasonably safe as marketed; (2)
> the product was used for a normal purpose; (3) the defect was a
> substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the
> exercise of reasonable care would not have both discovered the defect
> and apprehended its danger; and (5) the plaintiff would not have otherwise
> avoided the injury by the exercise of ordinary care.
>
> ***
>
> In a design defect case, the plaintiff must prove: (1) although the product
> was manufactured according to its intended design, the design itself
> devised a product that was not reasonably safe, and (2) there was a
> feasible alternative design for the product that would have been safer and
> that would have prevented the plaintiff's injury[.]
>
> ***
>
> To prove a defect in the form of a failure to warn, the plaintiff must show
> that: (1) the defendant manufacturer had a duty to warn; (2) against
> dangers resulting from foreseeable uses about which the defendant knew
> or should have known; and (3) failure to warn was the proximate cause of
> the harm.[27]  There is no duty to warn of well-known or obvious dangers.

---

[26]Holcomb does not contend that there was any manufacturing defect. Holcomb Dep. at p. 163.

[27]The elements of a failure to warn claim are the same under theories of strict liability and negligence. *Fane v. Zimmer, Inc.*, 927 F.2d 124, 130 (2d Cir. 1991) ("[W]here the theory of liability is failure to warn, negligence and strict liability are equivalent.") (citation and internal quotation marks omitted).

*Macaluso v. Herman Miller, Inc.*, No. 01 Civ. 11496(JGK), 2005 WL 563169 at *4 -5

(S.D.N.Y. Mar. 10, 2005) (citations omitted).

> With regard to design defect the claims, the  manufacturer's duty
>
> is not open-ended, and it is measured as of the time the product leaves the manufacturer's premises.  Thus, a manufacturer is not required to insure that subsequent owners and users will not adapt the product to their own unique uses.  That kind of obligation is much too broad and would effectively impose liability on manufacturers for all product-related injuries.

*Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 238, 700 N.E.2d 303 (1998).  Additionally, as to

such claims, "a manufacturer is not responsible for injuries resulting from substantial

alterations or modifications  of a product by a third party that render the product

defective or otherwise unsafe." *Id*., 92 N.Y.2d at 236.

### *Defendant's Motion to Preclude Plaintiff's Supplemental Expert Disclosure*

At the outset, the Court must decide whether it should consider the supplemental

expert evidence [#29] which Plaintiff submitted in opposition to Defendant's summary

judgment motion.   Specifically, Defendant maintains that the Court should exclude the

following information: 1) all testing and reports related to such testing; and 2) Holcomb's

previously unstated opinions, including those set forth in Docket No. [#29] at ¶ ¶ 75, 93.

*See*, Quinn Aff. [#33] at ¶ ¶ 17-20.  As to the supplementation of expert opinions,

> [i]t should be assumed that at the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought.
>
> ***
>
> [A party's] duty to supplement its initial expert report does not arise when [it] seeks to bolster its earlier submission, but rather, arises only if the expert subsequently learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete.

28

*Innis Arden Golf Club v. Pitney Bowes, Inc.*, No. 3:06 CV 1352(JBA), 2009 WL 5873112

at *3 (D.Conn. Feb. 23, 2009) (citations and internal quotation marks omitted).

To the extent that Docket No. [#29] contains new information, that exceeds the

scope of Holcomb's written report and deposition testimony, as opposed to merely re-

stating Holcomb's earlier opinions, the Court agrees that it violates FRCP 26(a)(2)(B),

and is subject to exclusion pursuant to FRCP 37(c)(1).  Specifically, the Court is referring

to all opinions concerning testing, and the opinions contained in paragraphs 75 and 93

of Holcomb's supplemental affidavit [#29].

This Court has previously set forth the legal principles applicable to Defendant's

motion to preclude, as follows:

> A party may not ordinarily defeat a summary judgment motion using
> information that was not disclosed during discovery. FRCP 26(a)(2)(B)
> governs the disclosure of expert reports, and requires, *inter alia*, that such
> reports state "all opinions the witness will express and the basis and
> reasons for them." FRCP 37(c)(1) provides a sanction if a party fails to
> disclose information as required by Rule 26(a), stating that "the party is not
> allowed to use that information or witness to supply evidence on a motion,
> at a hearing, or at a trial, unless the failure was substantially justified or is
> harmless." A district court has discretion whether to exclude such
> evidence:
>
>> In determining whether the district court acted within its discretion,
>> [the Second Circuit] considers (1) the party's explanation for the
>> failure to comply with the disclosure requirement; (2) the importance
>> of the testimony of the precluded witness; (3) the prejudice suffered
>> by the opposing party as a result of having to prepare to meet the
>> new testimony; and (4) the possibility of a continuance. The purpose
>> of the rule is to prevent the practice of 'sandbagging' an opposing
>> party with new evidence. Although a 'bad-faith' violation of Rule 26
>> is not required in order to exclude evidence pursuant to Rule 37, it
>> can be taken into account as part of the party's explanation for its
>> failure to comply.

29

*Haas v. Delaware and Hudson Ry. Co.*, 282 Fed.Appx. 84, 86 (2d Cir.2008) (citations and internal quotation marks omitted). "This analysis requires the district court to consider the importance of the testimony to the case, the prejudice to the party inconvenienced, and the administrative difficulty which the court itself would face." *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir.1988). Moreover,

> [b]efore the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses. Considerations of fair play may dictate that courts eschew the harshest sanctions where failure to comply is due to a mere oversight of counsel amounting to no more than simple negligence.

> *Id.*, 837 F.2d at 591 (citation and internal quotation marks omitted). On the other hand, where a party fails to disclose information in response to discovery demands, fails to explain such failure, and never asks to reopen discovery, a court does not abuse its discretion in precluding the evidence. *Haas v. Delaware and Hudson Ry. Co.*, 282 Fed.Appx. at 86–87.

*Woodworth v. Erie Ins. Co.*, 743 F.Supp.2d 201, 214-215 (W.D.N.Y. 2010).

Considering the foregoing factors, the Court notes, first, that as for Plaintiff's explanation for his failure to disclose this information sooner, Plaintiff suggests that the production of such additional evidence was necessitated by Brass's lack of expertise. However, Brass's report was disclosed to Plaintiff in or about June 2010, and Plaintiff deposed Brass on August 20, 2010. Plaintiff did not conduct the testing until December 2010. If Plaintiff believed that it was necessary to provide additional expert disclosure after deposing Brass, he should have done so prior to the expiration of the expert discovery deadline, or requested an extension of that deadline. *See, Revlon Consumer Prods. Corp. v. Ester Lauder Companies, Inc.*, No. 00 Civ. 5960 RMB AJP, 2003 WL

21751833 at *4 (Jul. 30, 2003) (Striking portions of expert's supplemental report that went beyond his original report and deposition testimony).

As for the remaining factors, the information is not overly important to Plaintiff's case, since Holcomb insists that the testing was not necessary to support his opinions. Moreover, Defendant would be prejudiced by the admission of such evidence, and would need to conduct additional discovery. Finally, the Court could grant a continuance. However, after weighing all of the factors discussed above, the Court finds that preclusion is appropriate.

### Defendant's Motion to Exclude Holcomb's Opinion Under FRE 702 and 403

The Court will next consider Defendant's motion to exclude the rest of Holcomb's opinion evidence, which was timely disclosed. The applicable legal principles are clear:

> The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence:
>
>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> Fed.R.Evid. 702. It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that the *Frye* test of general

acceptance in the scientific community was superceded by the Federal Rules); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.2002) (observing departure, under Federal Rule, from the Frye standard).

The shift under the Federal Rules to a more permissive approach to expert testimony, however, did not represent an abdication of the screening function traditionally played by trial judges. To the contrary, as *Daubert* explained, Rule 702 governs the district court's responsibility to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court clarified that, whether a witness's area of expertise was technical, scientific, or more generally "experience-based," Rule 702 required the district court to fulfill the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

*Daubert* enumerated a list of factors that, while not constituting a "definitive checklist or test," a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation. *See Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786. In addition to setting forth these criteria for testing an expert's methodology, the Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit*[28] of the

---

[28]"Ipse Dixit: [Latin "he himself said it"] . . . Something asserted but not proved <his testimony that she was a liar was nothing more than an ipse dixit>." Black's Law Dictionary (9th ed. 2009).

expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) [("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")].[29] Thus, we have previously stated that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.[30]

Even after determining that a witness is "qualified as an expert" to testify as to a particular matter, Fed.R.Evid. 702, and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will "assist the trier of fact." We have consistently held, in that respect, that expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991), by definition does not "aid the jury in making a decision"; rather, it "undertakes to tell the jury what result to reach," and thus "attempts to substitute the expert's judgment for the jury's," *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994).

In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given

---

[29] *See, General Elec. Co. v. Joiner*, 118 S.Ct. at 519 ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the [FRE] requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.").

[30] *See also, Amorgianos*, 303 F.3d at 267 ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.") (citation omitted).

the unique weight such evidence may have in a jury's deliberations. *See, e.g., Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (" 'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.' " (*quoting* Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended, 138 F.R.D. 631, 632 (1991))); *United States v. Young*, 745 F.2d 733, 766 (2d Cir.1984) (Newman, J., concurring) (noting that "the very breadth of the discretion accorded trial judges in admitting [the expert opinion of a detective testifying as to the criminal nature of a defendant's activities] under Rules 702 and 403 should cause them to give the matter more, rather than less, scrutiny. A trial judge should not routinely admit opinions of the sort at issue here and should weigh carefully the risk of prejudice.").

*Nimely v. City of New York*, 414 F.3d 381, 395-397 (2d Cir. 2005) (footnote omitted).

"The inquiry is a flexible one, and district courts enjoy considerable discretion in deciding on the admissibility of expert testimony." *U.S. v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (citations and internal quotation marks omitted).

Here, Defendant concedes that Holcomb is qualified as an expert with regard to the alleged design defect, but not as to the alleged failure to warn. However, Defendant maintains that Holcomb's theories, as to design defect and causation, fail to satisfy Rule 702, and would impermissibly mislead a jury in violation of Rule 403. The Court agrees.

At the outset, the Court finds that Holcomb's theory of design defect is not based on sufficient data  and is not the product of reliable principles and methods. In that regard, Holcomb's theory is that improper design placement of bolts allowed the brake housing to flex, causing the inboard brake pad to become "hung up," and that when sufficient brake pressure built up, the inboard brake pad jumped toward the disc, with a

sudden ratcheting effect.  Significantly, Holcomb has not performed any testing to substantiate his "sudden ratcheting" theory, nor has he recreated this alleged phenomenon.

Holcomb's theory rests, in part, on his assumption that at the time of the accident, the inboard brake pad was severely worn, for which he has some evidence, and his assumption that the outboard pad was not similarly worn, for which he has no evidence. Holcomb makes the latter assumption only because the outboard brake pad was not retained, from which he concludes that the pad must have been unremarkable.  This assumption is significant to Holcomb's theory, since it allows him to further assume that the inboard brake pad was hanging up at the time of the accident.  On this point, Holcomb indicates that an extremely worn inboard pad together with an unworn outboard pad would suggest that such condition did exist.  However, this assumption regarding the outboard pad is unsupported by the record, because the only person to examine both of the brake pads immediately following the accident, Carter, indicated that *both* brake pads had come apart. According to Carter, "[t]he brakes came apart. The equipment malfunctioned."  Carter Dep. at 133.  More specifically, Carter stated that, "*The brake pads had come apart. . . .  The shoes came off the backing*." *Id*. at 128 (emphasis added); *id*. at 135 (Indicating that Pfalzer removed both the inboard and outboard pads, which had come apart: "[He] took the old *pads*, what was left of *them*.") (emphasis added).  Such testimony indicates that both brake pads disintegrated, contrary to Holcomb's assumption.

Alternatively, Holcomb argues that the condition of the disc proves that the

"hanging up" condition existed at the time of the accident.  Specifically, Holcomb

contends that the outboard side of the disc had received essentially all of the wear

associated with braking action, which he attributes to the fact that the outboard pad had

been doing all of the braking since before the accident.  The Court finds, though, that

this contention is not well supported in the record.  For example, while Holcomb

maintains that the wear on the inboard side of the disc was insignificant, he did not take

any measurements of the respective sides of the disc to support that contention.

Instead, he bases such contention only on his visual estimation during the inspection on

April 20, 2010. *See*, April 28, 2010 report at p. 2.

    More importantly, even assuming, *arguendo*, that the hanging up condition

existed at the time of the accident, Holcomb's theory about the "sudden racheting" is

unsupported and internally inconsistent.  Specifically, Holcomb's opinion is that the

accident was caused by the supposed "ratcheting motion" of the inboard lining and

piston suddenly "jumping forward" toward the disc.  Holcomb's theory of the inboard

plate "jumping forward" necessarily assumes that the inboard brake lining was "hung up"

in the *retracted* position, leaving "a gap" between the inboard pad and the disc,

otherwise, there would be no space into which the inboard pad could jump forward. *See,*

*e.g.*, Holcomb Dep. at pp. 220-221 ("[W]hen the brake is applied, this [the inboard brake

pad] is still stuck, so this – this plate *does not move towards* the disc.") (emphasis

added); *see also*, Holcomb Dep. at p. 223 ("[I]t's jumping, and once it moves forward to

take up *the gap that exists*, at that time the system did not have enough stroke to

overcome *the gap that existed before it ratcheted*.") (emphasis added).  However, this

scenario is inconsistent with Holcomb's explanation for why the inboard pad was so heavily worn, which is because it was already resting *against* the moving disc. *See, e.g.*, Holcomb Dep. at pp. 208-210.  This inconsistency is further displayed in Holcomb's report:

> The inboard lining is pushed against the disc only when the apply force is large enough to overcome the restriction at the inboard Carrier-rail contact.
>
> *When the brakes are released, the inboard lining remains in contact with the disc, held by the restrained motion at the Carrier-rail interface.*  The disc, rotating at high speed (can be up to 1,000-2,000 rpm), wears away the inboard lining and heats up (thermal expansion of the disc potentially exacerbating the contact force on the inboard lining).[31]
>
> *Thus the inboard lining is subjected to relatively continuous and variable wear* factors while the outboard lining wears only when actual vehicle braking occurs.

Holcomb Report [#29], Ex. C at p. 7 (emphasis added); *see also*, Holcomb's report of inspection conducted on April 28, 2010 at p. 1 (Indicating that "[t]here was no discernible gap between the inboard lining and the disc."); *see also*, Holcomb Supplemental Aff.

---

[31] At deposition, Holcomb indicated that "a single prop shaft disc brake" was not an appropriate type of  brake to use on an industrial tractor, and could result in excessively high temperatures, because industrial tractors are constantly braking.  Holcomb Dep at pp. 183-204.  However, Holcomb indicated that agricultural tractors seldom use their brakes, and that he understood that the subject tractor was being used as an agricultural tractor. *Id*. at pp. 203-204.  In his report, Holcomb indicated that the alleged excessive heat buildup was caused by Defendant's "insecure installation," which caused the inboard pad to hang up, which then led to excessive heat. *See*, Holcomb Report at p. 2, ¶ 3.  At the same time, Holcomb indicated that using a sliding caliper brake without positive retraction "promote[d] excessive lining wear and heat build-up in the disc." *Id*. at ¶ 6.  On this point, Holcomb was clearly referring again to the inboard pad becoming hung up, since it was the only pad that allegedly failed to retract.  Moreover, Holcomb indicated that the *effect* of the increased heat was that the disc would expand and exacerbate the wearing-away of the inboard disc. *Id*. at p. 7.  Accordingly, Holcomb's comments regarding heat only go to explain how the inboard pad would become worn if it was "hung up"against the disc.  At deposition, after much questioning by Defendant's counsel as to how the alleged excessive heat might have contributed to the accident, Holcomb indicated that the alleged excessive heat might have contributed to causation "indirectly," but he did not explain how. *See*, Holcomb Dep. at pp. 184-204.  Accordingly, to the extent that Plaintiff seeks to have Holcomb opine that the use of a single prop shaft disc brake was a design defect that led to Plaintiff's injury, such opinion is not admissible under FRE 702 or 403.

[#29] at ¶ 30 (Indicating that the inboard brake pad was not "retracted as the brake system was released."); Holcomb Supplemental Aff. [#29] at ¶ 52 (Referring to ""premature wearing of the inboard pad *due to its inability to release from the brake disc*.") (emphasis added).[32]  Consequently, Holcomb has not explained how the envisioned "gap" could exist if the inboard pad is already contacting the disc, as he maintains.

Moreover, even further assuming *arguendo* that there was an appreciable gap between the inboard pad and the disc, so that the inboard pad could become unstuck, jump forward, and strike the disc, Holcomb has not adequately explained how such occurrence would cause the complete loss of braking function which Carter described. On this point, the Court appreciates that Holcomb's theory is that the inboard lining suddenly moved toward the disk, thereby causing the outboard pad to lose its force against the disc, due to insufficient stroke of the brake piston:

> It jumps toward the disc, and when it jumps towards the disc, that means that you need more stroke of the system.  You – you – instantly you lose braking because it's – it's jumping, and once it moves forward to take up the gap that exists, at that time the system did not have enough stroke to overcome the gap that existed before it ratcheted.

Holcomb Dep. at p. 223.  However, Holcomb has not recreated this alleged occurrence through testing or otherwise.  Nor has he identified any other instance, occurring anywhere or at any time, of brake failure due to the alleged sudden ratcheting effect.

In addition, Holcomb's sudden ratcheting theory receives scant attention or explanation in his report.  Rather, Holcomb devotes a great deal of time to explaining

---

[32]At oral argument, Plaintiff's counsel reiterated that the inboard brake pad becomes hung up against the disc, and does not retract, while the outboard pad retracts.

why the bolt placement on the retaining bar is incorrect, and how movement of that bar may have contributed to the inboard carrier and piston becoming "hung up." Furthermore, he devotes much discussion to the uneven wear of the disc and brake linings, and how the "hanging up" of the inboard lining and piston may have resulted in excessive heat buildup in the brake.  Those points, though, are largely irrelevant to causation of the accident, because, even assuming that the inboard brake pad was "hung up," the outboard pad was still able to  provide adequate braking power.[33]   In Holcomb's view, the complete loss of braking power would not have occurred without the additional occurrence of the alleged "ratcheting" effect,[34] and it is on that point that Holcomb has not provided a sufficient explanation.[35]   Holcomb's opinion on this point is *ipse dixit*, in the Court's view.

In his affidavit submitted in opposition to summary judgment, Holcomb attempts to expand his explanation of his ratcheting theory as follows: "Conceptually, what happened . . . is similar to what would happen if a person placed a block of wood and a shim inside a C-clamp, tightened the C-clamp down to prevent the items from moving, and then forcibly removed the shim.  The end result would be, of course, that the block

---

[33]There is unrefuted evidence that the Steiger was able to adequately brake with just the outboard brake pad. *See, e.g.*, Plaintiff's Memo of Law [#27] at p. 9 ("[I]t has not been disputed that the braking performance of a functional brake with *one intact brake pad and one worn down to the steel carrier would stop two Steiger tractors on a 15% grade.*  The maximum grade faced by the Steiger tractor at the time of the incident was estimated at 12.6%") (emphasis added)

[34]See, Pl. Memo of Law [#27] at p. 7 ("The incident was not caused, as suggested by Defendant's expert Ronald Brass, [by] *degraded* brake performance.  The incident was caused by the *complete* loss of braking.") (emphasis added).

[35]In one of his memos of law, Plaintiff merely states, in conclusory fashion: "This sudden motion released the force applied by the outboard pad to the brake disc, which prior thereto had provided all such braking action.  The design of the Steiger tractor's braking system could not accommodate this motion and complete loss of braking resulted." Pl. Memo of Law [#27] at p. 10.

of wood is no longer subjected to a clamping force sufficient to restrain it between the points of contact on the C-clamp." Holcomb Aff. [#29] at ¶ ¶ 39-40.  This example, though, does not seem apt, since a C-clamp cannot provide further clamping force without being manually tightened.  Therefore, removing the shim would result in the block of wood falling out of the clamp.  However, the subject braking system was under constant pressure from the air brake, which was pushing the inboard brake pad and piston toward the disc with great force.  Accordingly, after becoming "unstuck," as Holcomb maintains happened, the inboard pad and piston would have continued to apply force toward the disc.  Although Holcomb vaguely refers to there being "insufficient stroke" at that point, he does not explain this alleged occurrence.[36] Instead, such assertion is another instance of *ipse dixit*.

The Court further notes that at deposition, Holcomb gave seemingly inconsistent answers about whether, after the alleged sudden ratcheting effect, the operator would retain some braking ability. *See*, Holcomb Dep. at 223-224 (discussed above).  For example, at deposition, Holcomb twice denied that a lack of stroke would result in a complete loss of braking power:

---

[36]The brake stroke is affected by the functioning of the slack adjuster, which is adjusted to compensate for the wearing of the brake lining. *See*, Holcomb Dep. at pp. 143, 147.  Holcomb does not indicate whether this supposed lack of stroke is related to the fact that someone modified the Steiger after it left Defendant's control, by replacing the automatic slack adjuster with a manual slack adjuster. However, it seems from the record that if the brake pad linings disintegrated or came apart, as Carter maintains from his personal observation of them immediately following the accident, that such occurrence would be a much more likely explanation for a lack of stroke, since it is actually supported by facts in the record.  That is, if the brake pad linings came apart, there would presumably then be a much greater distance, or slack, between the lining carriers and the disc, than had existed previously, which would prevent the carriers from contacting the disc, because the stroke would be limited by the manual slack adjuster as it had been set while the linings were intact.  Moreover, even assuming that there was still sufficient stroke after the brake pads fell apart, there is no indication that the bare metal liner backings would have provided sufficient friction against the disc to provide braking power.

Q. If there was an event that caused the system to take more stroke than was available, what would be the effect of that?  Would that be the brakes wouldn't work?

A. *No*.

\*\*\*

Q. And if something was done that made it so that there was more stroke needed than was available, what effect would that have on the braking system?

A. If – if there's – if there's more stroke required to effectively put both linings in contact with the disc than is available, then the braking would be *very small*.

Holcomb Dep. at pp. 148-149 (emphasis added); *see also, id*. at pp. 223-224 (indicating that the alleged lack of stroke would result in diminished braking ability).  Thus, Holcomb indicated that the Steiger would retain some braking power.  However, such testimony does not mesh with the facts of the accident, since Carter indicates that there was a complete loss of braking power.  Moreover, Holcomb further indicated that braking power would not be restored until mechanical adjustments were made, *id*. at p. 223, but then indicated that braking power might increase if the "disc heated up," *id*. at p. 225.  Yet, elsewhere in this record, Holcomb has indicated that the disc was already heated up, due to the inboard pad dragging against it. *See*, Holcomb's report at p. 7 (Indicating that the inboard pad contacting the disc caused heat, which caused the disc to expand, which exacerbated the wear on the inboard pad).  Taken as a whole, Holcomb's opinion is that there should not have been a complete loss of braking function, while Carter's firsthand experience is that there was a complete loss of braking power.

For all of these reasons, the Court finds that although Holcomb is qualified as an expert, his opinions concerning the alleged design defect and causation are speculative

and not well supported, and are therefore inadmissible pursuant to FRE 702. Additionally, the Court finds that such evidence should be excluded under Rule 403, since its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

### *Plaintiff's Cross-Motion to Exclude Brass's Expert Testimony*

Plaintiff has cross-moved to exclude the opinions of Brass, because he is not a mechanical engineer, and because he purportedly lacks "familiarity with the principles and concepts underlying proper brake design and function." Pl. Memo of Law [#27] at p. 1.  On this point, Plaintiff contends that Brass's testimony should be excluded because he never personally designed a brake, and only "signed off" on the designs of his subordinates. *Id*. at p. 16-17.   However, the Court finds that Brass qualifies as an expert on the issue of tractor brake design, based on his education and  professional qualifications and experience as discussed above.

Plaintiff further indicates that Brass's opinions are not based on "scientific, technical, or other specialized knowledge," and in that regard he notes a number of areas where Brass disagrees with Holcomb. *Id*. at pp. 17-18.  The Court disagrees and finds that Brass's opinions are supported by the record and otherwise satisfy FRE 702. For example, Brass indicates that the accident was caused by the misuse of the Steiger, which consisted of using "the heavily equipped [attached plow] incident machine [Steiger], with a fully disabled transmission, with brakes known by the operator to be questionably maintained, and in the unanticipated circumstance of providing resistance to a towing tractor on a roadway of exceptional steepness." Brass Report  at p. 5.  With respect to this point, it cannot be disputed that Carter and Plaintiff were using the

Steiger, which was attached to a plow, and whose transmission was disabled, to provide braking for the Steiger and the International Harvester which was pulling against the Steiger, on a large hill.  This is contrary to the Steiger owner's manual, which clearly advises operators not to rely on the tractors brakes alone on steep hills, but to instead use the engine's braking power.  Moreover, Brass's opinion that the brakes were questionably maintained is borne out by Holcomb's own opinion, which is that the inboard brake pad was worn out long before the subject accident.  Nor has Plaintiff shown that Brass is incorrect in stating that the Steiger's brakes were designed and tested in conformity with SAE recommended practices and standards.   Plaintiff's motion to exclude Brass's opinion is denied.

### Defendant's Summary Judgment Motion

Defendant maintains that Plaintiff cannot establish either a design defect claim or a failure to warn claim.  More specifically, Defendant contends that Plaintiff cannot show a brake design defect or duty to warn, and alternatively, that Plaintiff cannot show that any such design defect or failure to warn was the cause of Plaintiff's injury.  The Court agrees.

### Design Defect Claim

As discussed above, the Court is excluding Holcomb's opinions regarding design defect and causation. Because of that, Plaintiff has no evidentiary proof in admissible form that the Steiger's brake system was defectively designed, or that any such defective design caused his injury.[37] *See, Soliman v. Daimler, AG*, No. CV

---

[37]Plaintiff acknowledges that Holcomb's opinion is essential for him to defeat the summary judgment motion. See, Pl. Memo of Law [#27] at p. 14.

10–408(SJF)(AKT), 2011 WL 6945707 at *5 (E.D.N.Y. Aug. 8, 2011) ("[U]nder New York

law, a plaintiff seeking to establish a design defect is required to provide expert

testimony as to the feasibility and efficacy of alternative designs.  The only exception to

this rule is if a reasonable alternative design is both obvious to and understandable by a

layperson.") (citations and internal quotation marks omitted).  Defendant is therefore

entitled to summary judgment on that claim.

>    *Failure to Warn Claim*

As for the failure to warn claim,[38] there are two issues: whether a "do not tow"

warning was required, and if so, whether Defendant's failure to provide such a warning

caused Plaintiff's injury.  In that regard, Plaintiff alleges that the Steiger had a "defective

condition, namely the faulty brakes," and that Defendant "failed to post any warnings,

signs, decals or other printed materials advising the user of the Steiger tractor that the

Steiger tractor should not be towed." Amended Complaint at ¶ ¶ 20-21.  Plaintiff further

contends that Defendant was "aware that towing such Steiger tractor presented a

substantial risk of serious injury." *Id*. at ¶ 57.  In sum, Plaintiff maintains that he was

injured because the Steiger's brakes failed, and that the brakes failed because the

Steiger was being towed.

However, as already discussed, Plaintiff cannot establish why the brakes failed.

At least, Plaintiff has not shown that the brakes failed due to a manufacturing defect or

due to Holcomb's proposed design defect.  The evidentiary proof indicates that the

---

[38] The Court is aware that "[t]he duty to warn of dangers in the use of the product exists even
though the product is perfectly designed and made." New York Pattern Jury Instructions – Civil 2:120 (3d
ed.) (citations omitted).  The Court is further aware that expert testimony is not required to establish a
failure to warn claim.

brakes failed because the brake pads fell apart.  Plaintiff, though, has not produced evidence that Defendant knew or should have known that the brake pads would fall apart, or that the brakes would otherwise fail in any way, if the Steiger was towed.  To the contrary, the record indicates that the Steiger's brakes, as designed and built, should have been sufficient to stop a tractor weighing twice what the Steiger weighed,[39] while descending a hill, even with just one functioning brake pad.  *See*, footnote 31 above (citing Plaintiff's Memo of Law [#27] at p. 9).  Moreover, there is no evidence that Defendant had notice of any type of brake problem with the Steiger model.  In fact, Plaintiff admits that there is no evidence of any other brake problem with this model of tractor at all, let alone due to towing.  Consequently, Plaintiff cannot demonstrate that Defendant had a duty to place a "do not tow" warning on the tractor.  *See, Liriano v. Hobart Corp.*, 92 N.Y.2d at 237 ("A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known.") (citations omitted).

Further, even assuming *arguendo* that Defendant had such a duty, Plaintiff has not raised a triable issue of fact as to whether the breach of such duty caused his injury.  In that regard, Plaintiff's own expert, Holcomb, does not believe that towing caused the accident.  Holcomb Dep. at pp. 141-142, 260.  Furthermore, Defendant's expert on this issue, Rhoades, indicates that the accident was "not related to a failure to appreciate [the] risk" involved.  Rhoades Aff. ¶ 13.  In that regard, Rhoades notes Plaintiff's

---

[39]The Steiger weighed approximately 47,000 pounds, while the International Harvester weighed only 15,000 pounds. Rhoades Aff. ¶ 12. Accordingly, even factoring in the additional weight of the plow that was attached to the Steiger, it does not appear that the two tractors exceeded the weight of which the Steiger brake should have been able to stop.

recognition that the towing operations was a "bad idea" and "should never have been done." *Id*. at ¶ 12.  In response, Plaintiff relies only on Miller's equivocal statement that if there had been a "do not tow" decal on the tractor, he "probably" would not have told Plaintiff and Carter to tow the Steiger. *See*, Abbott Aff. [#30], Ex. D, Miller Aff. at ¶ 5. The Court does not believe that such statement by itself is sufficient to create a triable issue of fact as to causation on the failure to warn claim.

CONCLUSION

Defendant's motion for summary judgment (Docket No. [#18]), Defendant's motion [#23] to exclude the testimony of Plaintiff's expert, and Defendant's motion [#32] to strike supplemental evidence and testing by Plaintiff's expert, are granted.  Plaintiff's cross-motion [#26] to strike the testimony of Defendant's expert is denied.  This action is dismissed.

SO ORDERED.

Dated: Rochester, New York
       March 6, 2012

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge